UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JANIS LOWE & ALAN TAYLOR, | § | |
|   *Appellants,* | § | CONSOLIDATED CIVIL ACTIONS |
| | § | H-07-4135 (LEAD) |
| v. | § | AND |
| | § | H-08-127 (MEMBER) |
| ANTELOPE TECHNOLOGIES, INC. | § | |
| *d/b/a* MCC COMPUTER CO., | § | |
|   *Appellee* | § | |
| | § | |

_____

| | | |
|---|---|---|
| | § | |
| IN RE: ANTELOPE TECHNOLOGIES, INC. | § | BANKRUPTCY CASE NO.07-31159-H3-11 |
| | § | |

### MEMORANDUM ORDER AND OPINION

Before the court is Janis Lowe and Alan Taylor's appeal from the bankruptcy court's order confirming the Reorganization Plan of Antelope Technologies pursuant to 11 U.S.C. § 101. Dkt. 13, Ex. 47. Also before the court is the appellee's motion to dismiss the appeal. Dkt. 12. Considering the motion, the briefs of the parties, the record on appeal, and the applicable law, the appellee's motion to dismiss is DENIED, the bankruptcy court's order is VACATED and this case is REMANDED to the bankruptcy court with instructions to hold a hearing on whether to appoint a Chapter 11 Trustee and to make findings of fact on whether the Plan was proposed in good faith.

### BACKGROUND

Antelope Technologies, Inc. d/b/a MCC Computer Company is the Appellee and the debtor in the underlying bankruptcy action. Dkt. 14. Appellants Janis Lowe and Alan Taylor are both minority shareholders of Antelope Technologies, Inc. ("Antelope") and, as detailed below, they are creditors in the underlying bankruptcy action. Alan Taylor ("Taylor") is also the former CEO of Antelope. While CEO, Taylor received financing from Scaltech International, Inc. ("Scaltech") and

Scaltech's owner, Klaus Genssler ("Genssler"). Dkt. 13, Ex. 34. Scaltech, through Genssler, executed a Mutual Nondisclosure and Non-Compete Agreement with Antelope. Additionally, Genssler provided a $250,000.00 loan to Antelope in July 2004. Dkt. 13, Ex. 28.

In August of 2004, Genssler proposed a company reorganization plan. Taylor and the Antelope Board of Directors questioned the motives of Genssler and rejected the plan as an underhanded business practice to oust the minority shareholders. Regardless of their objections, Genssler gained control of the Board of Directors and 51% of the stock by means which the minority shareholders allege were unethical and illegal. Dkt. 13, Exs. 6, 7, 27, 28, 34. Taylor resigned as CEO in September 2004 stating that he felt that Genssler was directing Antelope in an "unethical and predatory direction." Dkt. 13, Ex. 27. Genssler then installed Thomas Lykos ("Lykos"), Genssler's own attorney, as interim CEO of Antelope. Dkt. 13, Ex. 26.

During this period, the Cardenas family oversaw the Antelope manufacturing facility in Switzerland. The Cardenas family also held officer, director, and shareholder roles in Antelope. Dkt. 13, Exs. 5, 6. The computer hard drives manufactured at the Cardenas's facility contained Antelope's design and production information. Dkt. 13, Exs. 6, 7, 26, 27. The hard drives were removed from the facility in September of 2004, and shortly thereafter, the Cardenas family, Genssler, and Lykos formed MCC Computer Company. Dkt. 13, Exs. 2, 27. In November 2004, MCC began to market a product identical to Antelope's product. Dkt. 13, Ex. 6. According to appellants, during the formation of MCC, a series of ghost financial transactions occurred, giving the impression that Antelope loaned money to MCC. Dkt. 13, Ex. 17. However, there is no record of transfers of money and the appellants allege that this fraudulent sale was planned to conceal the theft of the Antelope hard drives. The appellants allege that both that the removal of the hard drives

2

and immediate formation of MCC was illegal[1] and that MCC's product was actually Antelope's product with a stick-on label covering the Antelope trademark. Dkt. 13, Ex. 28. They also allege that additional product changes were based upon Antelope's misappropriated technology from the missing hard drives.

The Cardenas family and Genssler were majority shareholders of both Antelope and MCC. Genssler, while maintaining his position as the majority shareholder of Antelope, was also the president of MCC. Dkt. 13, Exs. 27, 28, 31. Through Scaltech, he provided funding and loans to MCC in violation of the Mutual Non-Compete Agreement with Antelope. Dkt. 13, Ex. 27. The appellants assert that Antelope's licenses, technology, and product were being illegally produced, marketed, and sold by MCC. Dkt. 13, Exs. 27, 28. MCC produced the allegedly misappropriated technology for three years while Antelope, under the direction of Lykos, remained idle.

In February of 2005, appellants Lowe and former CEO Taylor joined twenty-seven other minority shareholders in a suit against Lykos, the Cardenas family, Genssler, Scaltech, and MCC. Dkt. 13, Ex. 27. The Shareholder Litigation alleged: (1) violations of the RICO Act; (2) violations of the Lanham Act; (3) theft of product as defined by 18 U.S.C. §1061(5); and (4) the breach of the Mutual Nondisclosure and Non-Compete Agreement .

Additionally, the Shareholder Litigation cited a pattern of racketeering activity and a disregard for the fiduciary duties owed Antelope and the company shareholders. Dk. 14. The Shareholder Litigation was brought in the United States District Court for the Eastern District of Texas. Notably, all of the minority shareholders' claims, including their RICO claim were strong enough to withstand a 12(b)(6) motion to dismiss. *Lowe v. Eltan, B.V.*, No. 9:05-CV38, Dkt. #75 (E.D. Tex. Mar. 27, 2006).

---

[1] Apparently, the Swiss government agreed and filed charges against the Cardenas family, Genssler, and numerous others. Dkt. 13, Ex, 17.

Antelope filed for bankruptcy on February 14, 2007. Antelope's CEO, Lykos, has admitted that the upcoming Shareholder Litigation trial prompted the filing of the Chapter 11 petition. Dkt. 13, Ex. 34. Despite the admitted motivation for the bankruptcy and financial implications of the Shareholder Litigation, the appellee's Schedule B did not list the Shareholder Litigation as an asset. Dkt. 13, Ex. 1.

In an attempt to prevent the Shareholder Litigation from being derailed, the appellants filed a Motion for Relief from Automatic Stay. Although the Shareholder Litigation was not on the appellee's Schedule B, and it has never amended it to add the Shareholder Litigation, in its response to the Stay Motion it took the position that the Shareholder Litigation was property of the bankruptcy estate. Dkt. 13, Exs. 11, 26, 28. A final hearing on the Stay Motion was set for November, 2007. Dkt. 13, Ex. 42.

However, before the Motion for Relief From Automatic Stay was heard, the Cardenas family filed a Motion to Compromise in October of 2007. Under the Compromise, the Cardenas family, along with Genssler, would remain majority shareholders in Antelope and MCC. Dkt. 13, Exs. 37, 61. The Compromise would return a portion of the Cardenas family shares to Antelope, but allow the Cardenas family to retain a critical number of voting shares. Thus, the Cardenas family would retain a vote for the Plan's confirmation. Most importantly, the Compromise would release the Cardenas family from any claims brought against them in the Shareholder Litigation. The appellants filed an objection to the Compromise Motion, but the Compromise Motion was granted after the confirmation of the Plan. Dkt. 13, Ex. 61.

The appellee failed to include detailed financial statements regarding the suspect acquisition of MCC and the respective assets in the filed schedules. And, at the required Meeting of Creditors, Lykos testified that he had no substantive knowledge of MCC. Dkt. 13, 27. However, contrary to

4

that assertion, Lykos stated in his deposition that he is the individual who reserved the MCC name with the Secretary of State.  Moreover, Lykos further illustrated his knowledge of the financial relationship between Antelope and MCC when he testified that he was aware of Antelope's foreclosure upon the notes in default executed by MCC, and that Antelope acquired the assets of MCC through the foreclosure of notes owed to Genssler and Scaltech.

In October of 2007 the appellants filed an Objection to the appellee's proposed Plan of Reorganization, asserting that the Plan had been proposed in bad faith.  Dkt. 13, Ex. 27.  Shortly after, the appellants filed a Motion to Appoint a Chapter 11 Trustee.  Dkt. 13, Ex 28.  Appellants list three primary reasons that a Chapter 11 Trustee should be appointed.  First, they argue a Trustee would conduct an investigation of alleged fraud and mismanagement.  Second, they request an independent evaluation of both the Shareholder Litigation and the release of the Cardenas family from liability.  And, third, they state that they believe that the Chapter 11 petition was filed as part of an underlying fraudulent scheme to oust the minority shareholders.

In response to the Motion to Appoint a Chapter 11 Trustee, the Cardenas family requested an emergency hearing on the Compromise Motion.  Dkt. 13, Ex. 30.  The Confirmation Hearing was held on October 17, 2007, approximately one week after the appellants filed the Motion to Appoint a Chapter 11 Trustee.  BK Dkt. 93.[2]  The hearing on the Trustee Motion was scheduled for a date after the Confirmation Hearing.

At the Confirmation Hearing, the bankruptcy court heard testimony regarding the proposed Confirmation Plan.  During the hearing, the U.S. Trustee's attorney advised the court that he believed the Trustee Motion should be heard prior to confirmation of the Plan.  BK Dkt. 93 at 6.  Also at the hearing, the appellants made repeated attempts to argue that the Plan was proposed in bad

---

[2] Bankruptcy Case Number 07-31159-H3-11

faith. They attempted to introduce evidence proving that the release from liability under the Shareholder Litigation was the appellee's ultimate intention in filing for bankruptcy. However, in every instance, the appellee objected that the testimony was irrelevant and inadmissible. All of the appellee's objections were sustained, and no evidence of the Shareholder Litigation was admitted on the record. BK Dkt. 93 at 25-31.

On November 20, 2007, the Order confirming the appellee's Chapter 11 Plan of Reorganization was signed. Dkt. 13, Ex. 47. The court did not hear either the Stay Motion or the Motion to Appoint a Chapter 11 Trustee. Dkt. 13, Exs. 51, 60. Each motion was denied as moot. However, the Compromise Motion was approved on December 11, 2007.

Under the Plan of Reorganization, Scaltech, owned by Genssler, was a secured creditor. Dkt. 13, Ex. 47. Scaltech was awarded the largest number of shares in Antelope d/b/a MCC and was released from liability in the Shareholder Litigation. In essence, Genssler, was paid in full through Scaltech, and avoided the derivative lawsuit. Two classes of unsecured creditors were paid a cash equivalent of 5% of the estimated unsecured non-priority claims against the debtor's estate. The Shareholder Litigation claims involving parties from the bankruptcy action terminated because, under 11 U.S.C. § 1141(d)(1), the debtor is discharged from any debt that arose before the date of the confirmation. Although the Shareholder Litigation was never included on the schedules, it was disposed of as an asset in the Plan of Reorganization. The plan has now been fully consummated. Dkt. 13, Ex. 47.

## ANALYSIS

On appeal from the bankruptcy court, the appellants argue that the plan was not proposed in good faith. The appellants also argue that the bankruptcy court erred in entering the confirmation order prior to hearing the Trustee Motion, the Motion to Lift Stay, and their objections to the

Debtor's Motion to Compromise. The appellees' respond that the doctrine of equitable mootness prevents the court from setting aside the Plan.

**1.     Standard of Review**

When reviewing a bankruptcy court's decision in a core proceeding, the district court functions as an appellate court and applies the standard of review generally applied in federal court appeals. *See Webb v. Reserve Life Ins. Co.*, 954 F.2d 1102, 1103-04 (5th Cir. 1992). A bankruptcy court's findings of fact are reviewed for clear error, with proper deference to that court's opportunity to make credibility determinations. FED. F. BANKR. P. 8013; *In re McDaniel*, 70 F.3d 841, 842-43 (5th Cir. 1995). While no factual findings may be disturbed unless clearly erroneous, the failure to find facts necessary to support an outcome is an error of law. *Hendrix v. Joseph*, 559 F.2d 1265, 1268 (5th Cir. 1977). Errors of law are reviewed *de novo*. *Elmwood Dev. Co. v. Gen. Elec. Pension Trust*, 964 F.2d 508, 510 (5th Cir. 1992). Under *de novo* review, the court makes an independent conclusion without deference to the bankruptcy court's analysis and conclusions. *See Coston v. Bank of Malvern*, 987 F.2d 1096, 1099 (5th Cir. 1992).

**2.     Equitable Mootness**

The appellee argues that this appeal of the order confirming the Plan is moot under the doctrine of equitable mootness. In a bankruptcy context, equitable mootness is a recognition by the appellate courts that there is a point beyond which they cannot order fundamental changes in reorganization actions. *Manges v. Seattle-First Nat'l Bank,* 29 F.3d 1034, 1039 (5th Cir. 1994). The equitable mootness doctrine is a balancing test between the equitable concerns for finality and good faith reliance on a judgment and the competing interests that underlie a party seeking review of a bankruptcy order that adversely affects the party. *Id.* The Fifth Circuit applies the following three-factor test to determine whether an appeal of a reorganization plan is moot: "(1) whether a stay has

been obtained; (2) whether the plan has been 'substantially consummated; and (3) whether the relief requested would affect either the rights of the parties not before the court or the success of the plan." *Id.*

As a threshold matter, the appellants argue that the court should not apply the doctrine of equitable mootness in this case because the appellee proposed the Plan in bad faith and, therefore, does not have clean hands. "[H]e who comes into equity must come with clean hands." *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 US 806, 815, 65 S. Ct. 993 (1945). The doctrine of equitable mootness is an equitable doctrine, requiring that the party seeking to uphold the Confirmation Plan must have proposed the Plan in good faith. "Bankruptcy Courts are courts of equity" and "a court of equity is enabled to frustrate fraud and work complete justice." *Pipkins-Thomas v. United States*, 223 Fed. Appx. 310, 313 (5th Cir. 2007). The doctrine of equitable mootness should not be applied when the opposing party has made allegations that the Plan was procured by fraud or proposed in bad faith. *See In re Seeburg Corp*, 10 B.R. 326, 328 (N.D. Ill. 1981). The appellants allege that the bankruptcy itself was part of a scheme to oust minority shareholders, and not a good faith attempt to rebuild a business

The court agrees. The circumstances surrounding the filing of Chapter 11 bankruptcy and the formulation of the Reorganization Plan raise some questions regarding the good faith of the Plan. Because a formal fact-finding was not conducted and the Motion to Appoint a Chapter 11 Trustee went unheard, this court declines to invoke the doctrine of equitable mootness for this appellee on this record.

**3.      Requirement that the Plan is Proposed in Good Faith**

Before a Plan of Reorganization is confirmed, 11 U.S.C.S §1325(a)(3) requires an affirmation that the Plan was proposed in good faith. In the absence of an allegation of fraud or bad

8

faith in obtaining the confirmation, "the doctrine of res judicata applies with respect to matters that are covered by a plan of reorganization confirmed by a final order." *Stoll v. Gottlieb,* 305 U.S. 165, 170-71, 59 S. Ct. 134 (1938). In the case at hand, all avenues through which the appellants could raise allegations of fraud were blocked. And despite the appellants' repeated attempts to raise the issue, the question of good faith was never directly addressed. The Fifth Circuit has held that the rules of equity require flexibility to ensure that a just result is achieved. *Nikoloutsos v. Nikoloutsos*, 199 F.3d 233, 237 (5th Cir. 2000) (holding that the bankruptcy court and district court abused their discretion by ignoring creditor spouse's informal proof of claim, objections to conversion of plan, and objection to discharge, despite inequities and obvious fraud committed by debtor, including failure to list items on schedules).

### A.   Allegations of Fraudulent Conduct

A plaintiff seeking a revocation of a bankruptcy order must establish each of the traditional elements of fraud: (1) that the debtor or proponent made a materially false representation or omission; (2) that the representation was either known to be false, or was made without belief in its truth, or was made with reckless disregard for the truth; (3) that the representation was made to induce the court to rely upon it; (4) the court did rely upon it; and (5) that as a consequence of such reliance, the court entered the confirmation order. *Id.*

The intent of the debtor to defraud is often inferred from circumstantial evidence, including: (1) the lack or inadequacy of consideration; (2) the relationships between the parties; (3) the retention of possession, benefit or use of the property; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after incurring the debt, onset of financial difficulties, or pendency of suits by creditors; and (6) the general chronology of the events and

transactions under inquiry. *Id.* In the matter before the court formal fact-findings were not conducted. *Cadle Co. v. Pratt,* 411 F.3d 561, 565 (5th Cir. 2005) (a complete analysis of the factors requires findings of fact). However, based on the record before it, the court finds several indicia that at the very least the appellee intended to defraud the bankruptcy court. The contentious relationship between the appellants and appellee, as evidenced by the claims in the Shareholder Litigation suit, were not addressed. The appellee's failure to list the Shareholder Litigation on its Schedule B even though avoiding liability was its primary motivation for the bankruptcy suggests an intent to deceive. The pendency of the Shareholder Litigation itself adds to the overall picture.[3] Furthermore, the chronology of the bankruptcy proceedings, including the consummation of the plan before the set date of the Trustee Motion hearing leads this court to surmise that the Plan, indeed the entire bankruptcy, may not have been in good faith.

### B.     The Totality of the Circumstances

When the circumstances are unclear as to whether the Plan was proposed in bad faith and factual findings have not been made, the Fifth Circuit has held that courts should review the totality of the circumstances. *In re Chaffin*, 836 F.2d 215, 216 (5th. Cir. 1988). Under this test, the court considers such factors as: (1) whether a creditor has objected to the plan; (2) the reasonableness of the proposed repayment plan; (3) whether the plan reflects the debtor's ability to pay; (4) whether the debtor genuinely intends to effectuate the plan; (5) whether there is any evidence of misrepresentation, unfair manipulation, or other inequities; (6) whether the filing of the case was part of an underlying scheme of fraud and; (7) whether the plan shows an attempt to abuse the spirit of the bankruptcy code. *Stanley v. Stanley*, 224 Fed. Appx. 343, 346 (5th Cir. 2007).

---

[3] The complaint and amended complaints in the Shareholder Litigation survived serial 12(b)(6) motions to dismiss on the merits regarding the alleged violation of the Lanham Act, the Rico Act, theft of product defined by 18 U.S.C. § 1061 (5), and the violation of the Non-Compete Agreement. *Lowe v. Eltan, B.V.*, No. 9:05-CV38, Dkt. #75 (E.D. Tex. Mar. 27, 2006).

### i.  *Objections by creditors*

In reviewing the totality of the circumstances surrounding the Plan, the court should take into account any objections made by creditors to the proposed Plan. Objections based on evidence of past fraudulent behavior and mismanagement are relevant and may constitute grounds for revocation of a confirmation plan. *Official Comm. of Unsecured Creditors v. Michelson,* 141 B.R. 715 (Bankr. E.D. Cal. 1992) (overturning a plan because creditor's objection that debtor failed to disclose that the debtor's proposed turnaround business manager had recently been indicted for fraud and that previous enterprise operated by that manager had filed for relief under Chapter 7 was a valid). In the case at bar, the appellants filed an objection to the proposed Plan, arguing that the plan had been proposed in bad faith. The appellants objected that Genssler, Lykos, and the Cardenas family were defendants in a derivative suit the Eastern District of Texas found meritorious enough to survive the defendants' 12(b)(6) motion to dismiss. However the objection was overruled. Dkt. 13, Ex. 27. Moreover, Lykos freely admitted that the Shareholder Litigation was the reason for filing bankruptcy, yet it never appeared on the schedules. And, the bankruptcy achieved its goal: the Compromise Plan and the Confirmation Plan disposed of the Shareholder Litigation in its entirety and rid appellee of minority shareholders that might question its management decisions. The appellants' objections to the proposed Plan's handling of the Shareholder Litigation should have been subject to a formal fact-finding inquiry, to ensure that the correct result was attained.

### ii.    *The reasonableness of the proposed repayment plan, the debtor's ability to pay, & the debtor's overall intentions*

Next, the court must review the financial aspects of the Plan, as well as the intentions of the debtor to consummate the Plan. Congress has specified that a Plan must be financially reasonable, stating that "any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in

connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable." 11 U.S.C. § 1129(a)(4). The Fifth Circuit describes "reasonable" as "a relatively open-ended standard that is potentially ambiguous." *Cajun Elec. Power Coop. Inc. v. SW. Elec. Power Co.*, 150 F.3d 503, 517 (5th Cir. 1998) (defining "reasonable" in the context of a payment made pre-confirmation). Every case will redefine what "reasonable" means, and this definition often hinges on who is making the payments at issue, who receives those payments, and whether the payments are made from assets of the estate. *Id.*

In the instant case, the appellee and appellants disagree as to whether the plan is reasonable. The appellees proposed the plan, and have demonstrated both an ability to pay and an intention to pay by already consummating the plan. However, the appellants argue that the plan is not reasonable because payments were made to a creditor who is also a debtor. Dkt. 13, Ex. 47. Scaltech, owned by Genssler, was the main secured creditor, and received a larger payment than any other creditor in the Plan. Genssler is also Antelope's majority shareholder. Scaltech was awarded the majority of the appellee's shares and was released from liability in the Shareholder Litigation. Therefore, in a roundabout way, Genssler was paid in full and avoided the derivative lawsuit.

The Cardenas family was also released from litigation under the Compromise. And, although they paid shares to Antelope, the Cardenas family maintained the minimum number of shares required to vote. These shares allowed the Cardenas family to vote for confirmation of the Plan. Dkt. 13, Ex. 61. Plan confirmation benefitted the Cardenas family because they maintained their management role within the company without threat of the derivative lawsuit.

### iii.  *Evidence of misrepresentation, unfair manipulation, or other inequities*

The record in this case leads the court to believe that there is evidence of misrepresentation, unfair manipulation, and possibly other inequities. First, it appears that the appellee misrepresented its estate to the court by not amending the bankruptcy schedules. The failure to disclose all assets

12

on a bankruptcy schedule is considered by courts to be a fraudulent misrepresentation. *Nikoloutsos v. Nikoloutsos*, 199 F.3d at 237; *In re Ronstadt*, 121 Bankr. 45, 50 (Bankr. D. Haw. 1990) (non-disclosure of assets on a bankruptcy schedule is evidence of misrepresentation sufficient to find bad faith on part of the debtor). In the present case, the appellee did not list the Shareholder Litigation as part of the bankruptcy estate. After the appellants filed a Motion for Relief from Automatic Stay to continue prosecution, the appellee took the position that the litigation was part of the bankruptcy estate. However, it never amended its schedule to include the Shareholder Litigation, and the litigation was ultimately disposed of in the Reorganization Plan.

Second, the chronology of the events both pre-confirmation and post-confirmation suggest a degree of manipulation on the part of the debtor. The immediate filing of bankruptcy in response to a pending suit by creditors often suggests an intent to defraud. *Cadle Co. v. Pratt,* 411 F.3d at 565; *see also In re Baum*, 248 Fed. Appx. 599, 604 (5th. Cir. 2007); *In re Castanet*, 873 F.2d 89, 91 (5th. Cir. 1989). The debtor's open admission that it filed for Chapter 11 bankruptcy to avoid the pending Shareholder Litigation certainly bolsters the suggestion of fraud.

Third, the accelerated consummation of the plan is an indicium of fraud because a Motion to Appoint a Chapter 11 Trustee and a Motion to Stay were pending. In *Meza v. Truman,* the Fifth Circuit held that a trustee's motion to modify was not untimely, despite the plan's consummation, because the debtors accelerated their payments in order to avoid a hearing on the trustee's motion. *Meza v. Truman*, 467 F.3d 874, 878 (5th. Cir. 2006). If a trustee files a modification motion and the debtor then attempts to complete payments, courts view the debtor as unfairly circumventing the creditor's right to a hearing on the motion. *Id.*

In the present case, as in *Meza,* the creditors' hearing on the Motion to Appoint a Chapter 11 Trustee was scheduled after the confirmation conference. The debtor quickly consummated the plan before the hearing could take place, and as a result, the bankruptcy court denied the Trustee Motion.

Although the trustee had already been appointed in *Meza*, the equitable principle is comparable to the case before the court. A trustee is appointed to ensure that a party does not engage in fraud. During the Confirmation hearing, the Trustee for the United States recommended that the appellants' Motion to Appoint a Chapter 11 Trustee should be heard prior to confirmation. The debtor's expeditious consummation to avoid the hearing points to manipulation of the system.

### iv.    *Whether Chapter 11 filing is an underlying scheme of fraud and an attempt to abuse the spirit of the bankruptcy code*

And last, when viewing the totality of the circumstances, courts should consider whether the filing of the Chapter 11 petition was part of an underlying scheme of fraud or an attempt to abuse the spirit of the Bankruptcy code. *Stanley*, 224 Fed. Appx. at 346. The underpinning of the spirit of the bankruptcy doctrine is forgiveness of the honest but unfortunate debtor. *In re Ronstadt*, 121 Bankr. at 49-50. A debtor is to receive a fresh start, "free from the weight of oppressive indebtedness, and obligations and responsibilities consequent upon business misfortunes." *Id.* at 50-51. This opportunity is not extended to the debtor who has "engaged in grossly irresponsible or fraudulent conduct, has been recalcitrant during the case, or has overutilized the privilege." *Id.*

Without findings of fact by the bankruptcy court, this court must view the record to determine the circumstances surrounding the bankruptcy and resulting plan. In the record, the court sees a debtor who admittedly filed the petition to avoid a derivative suit by minority shareholders, but did not list that litigation on its schedule B. The Plan resulted in the ouster of those same minority shareholders. Essentially, the largest creditor was also the majority shareholder of the debtor. And to avoid a hearing on the minority shareholders' Motion to Appoint a Chapter 11 Trustee, the Plan was quickly consummated. A more textbook example of the abuse of the spirit of the Bankruptcy Code is difficult to fathom. Accordingly, the totality of the circumstances surrounding the bankruptcy petition and resulting Plan dictates that the order confirming the Plan is VACATED.

## CONCLUSION

After consideration and for the foregoing reasons, the appellee's motion to dismiss is DENIED. The bankruptcy court's order is VACATED, and this case is REMANDED to the bankruptcy court with instructions to: (1) hold a hearing on whether to appoint a Chapter 11 Trustee; and (2) make findings of fact on whether the Plan was proposed in good faith.

It is so ORDERED.

Signed at Houston, Texas on August 11, 2008.

_____
Gray H. Miller
United States District Judge

TO ENSURE PROPER NOTICE, EACH PARTY RECEIVING THIS ORDER SHALL
FORWARD IT TO EVERY OTHER PARTY AND AFFECTED NONPARTY